UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEMAJIO JEROME ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00959-JPH-TAB |
| | ) | |
| LAWSON Sergeant, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MEDICAL DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT, DENYING DEFENDANT COUCH'S MOTION FOR SUMMARY
JUDGMENT, AND GRANTING IN PART AND DENYING IN PART STATE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

An inmate at Correctional Industrial Facility ("CIF") intentionally flooded his cell, creating a mess in Plaintiff Demajio Ellis's housing unit. Mr. Ellis filed this civil rights lawsuit alleging that the feces-and-urine-contaminated water ended up in his food, causing him illness, and in his cell, causing him to slip and fall.

The Court permitted Mr. Ellis to proceed on Eighth Amendment conditions-of-confinement claims, Eighth Amendment medical deliberate indifference claims, and a First Amendment retaliation claim. Dkt. 28. Defendants have moved for summary judgment. Dkts. 87, 91, 97. Because Mr. Ellis has not designated evidence showing that Defendants were deliberately indifferent to his medical needs, summary judgment is **granted** as to all claims against Medical Defendants and medical treatment claims against State Defendants. Additionally, Mr. Ellis has not designated evidence showing that one of the defendants retaliated against him. However, disputes of material fact

preclude summary judgment as to some of the conditions-of-confinement claims.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ.

P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

The summary judgment record contains video of the incident. "[W]here a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Ellis as the non-moving party and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties and Relevant Meal Policy

Mr. Ellis is an Indiana Department of Correction ("IDOC") inmate who at all relevant times was housed in A-unit, a restricted housing unit ("RHU"), at CIF. Dkt. 105-1 at 2.

State Defendants were all employed at CIF. Dkt. 40 at 1-2. Eric Fonseca and Janna Carey were caseworkers. *Id.* Blade Looney, Tristan Harrold, Nathan Helle, Kaylee Ross, Matthew Perry, and Carmen Samaniego-Puga were

correctional officers. *Id.* Emmett Scott was a correctional lieutenant, and Joseph Lawson was a sergeant. Dkt. 24.

Nurse Tina Collins, Nurse Alisha Richey, Nurse Shannon McCord, and Nurse Assistant ("NA") Andrea Fulton were employed by Centurion Health at CIF. Dkt. 42 at 1.

Defendant Gregory Couch was the floor supervisor for Aramark Correctional Services, LLC, at CIF. Dkt. 90-1 at ¶ 3. Aramark provides food services at CIF pursuant to a contract between Aramark and IDOC. *Id.* at ¶ 2. Mr. Couch oversaw the preparation of meals for inmates. *Id.* at ¶ 5.

The meals served to inmates in RHUs are delivered to the units on bread racks either in sacks or on trays. *Id.* at ¶ 7. Once the meals are prepared, they are placed on a bread rack and then either an Aramark employee or an inmate worker delivers the rack to the RHU, and an officer employed in the RHU then distributes the meals to the inmates from a cart. *Id.* at ¶¶ 10, 12. The carts are cleaned regularly. Dkt. 105-6 at 6.

IDOC has a Tray Replacement Policy wherein an inmate can request a replacement tray if the meal he received is unsatisfactory. Dkt. 90-1 at ¶ 14. The inmate would report the perceived issue to a correctional officer, and if the officer agrees that the complaint about the tray is valid (*e.g.*, that the food was under temperature or that there were foreign objects in it), the officer issues a new tray to the inmate. *Id.* at ¶ 15; dkt. 105-6 at 7.

**B. The Flooding Incident**

On May 1, 2023, an inmate housed on the second floor of A-unit flooded his cell with wastewater. Dkt. 105-1 at 2. The contaminated water poured from the top range to the bottom range and soiled an empty food cart that was sitting on the first floor. *Id.*

A video shows the housing unit after the flooding. Ex. A. First, correctional staff placed towels in front of cell doors to prevent the water from entering inmates' cells. *Id.* at 10:11-11:21. Then, correctional staff took turns squeegeeing the water out of the housing unit towards the outside. *Id.* at 15:08-20:46; 29:30-35:30, 55:02-1:00:21. An officer removed the cart that was in the path of the wastewater. *Id.* at 14:30-14:43.

One of the officers who squeegeed the water was Officer Samaniego-Puga. *Id.* at 29:30-32:10. At one point, she stops at Mr. Ellis's cell and speaks to him, before she resumes cleaning. *Id.* at 30:17-30:40; dkt. 105 at 16 (Mr. Ellis identifying his cell as the second cell). Mr. Ellis attested that Officer Samaniego-Puga stopped to taunt him that she was directing water into his cell as revenge for him suing her in another matter. Dkt. 105-1 at 7. The video, however, shows that Officer Samaniego-Puga pushed the water with the squeegee towards the outside, not towards any individual's cell. Ex. A at 29:30-30:40.

The video shows an officer delivering sack lunch meals on a cart. *Id.* at 1:00:21-1:01:48. The sacks were on thick black trays that were placed on a table in the middle of the unit. *Id.* at 1:15:19-1:16:25. Officers put gloves on

5

and distributed the sacks to the inmates. *Id.* at 1:19:20-1:20:32. Mr. Ellis does not dispute that the lunch sacks were not contaminated. Dkt. 105 at 18.

A daily log from Mr. Ellis's housing unit reflects that around 2:00 p.m., Mr. Ellis reported that "he was covered in feces due to the flooding earlier on. He acknowledged he had both soap and running water in his cell." Dkt. 105-3.

The video does not show dinner service that day. *See* Ex. A. Mr. Ellis attested that he told Defendants "Scott, Lawson, Samaniego, Harrold, Looney, Helle, Carey, Fonseca, [and] Couch" that the food cart and crates were contaminated and that the inmates could not eat food from them. Dkt. 105-1 at 3. Mr. Ellis attested that Mr. Couch came to his cell around 5:00 p.m. "and [Mr. Ellis] told him everything about the contaminated cart." *Id.* Mr. Ellis attested that Mr. Couch looked at the cart and could see puddles of water on it, and that as workers distributed the dinners, they said that they smelled like feces. *Id.* at 6. Mr. Couch attested that while he vaguely recalls this incident, he does not remember speaking with Mr. Ellis or being informed of contaminated food in the housing unit by anyone. Dkt. 90-1 at ¶¶ 11-12. Mr. Couch attested that he had no control over the Tray Replacement Policy, but if someone had asked him to prepare new food for the inmates in the RHU, he would have done so. *Id.* at ¶¶ 16-17.

Mr. Ellis attested that his dinner tray was smashed open and that wastewater splashed onto it. Dkt. 105-1 at 4. Mr. Ellis told Sgt. Lawson that his tray was contaminated, but Sgt. Lawson continued to distribute meals. *Id.* Mr. Ellis was hungry, so he began eating the food but soon noticed that the

6

"food tasted weird" and was making him gag. *Id.* at 5. He noticed he "was eating feces" and then became ill and started vomiting. *Id.* He showed the tray to Sgt. Lawson who responded that Mr. Ellis was not going to receive another tray. *Id.*

Mr. Ellis attested that he informed Defendants Samaniego-Puga, Lawson, Carey, and Fonseca that his cell and clothing were contaminated with sewage water. *Id.* at 7-9. Despite this, Mr. Ellis remained in his cell without cleaning supplies or clean clothes for several days. *Id.*

**C. Mr. Ellis's Medical Treatment**

On the day of the flooding, around 10:30 a.m., Mr. Ellis slipped on the water in his cell and fell. *Id.* at 8. Sgt. Lawson called medical to report the fall. *Id.* Nurse Richey went to Mr. Ellis's housing unit to check on him but was unable to do so due to understaffing and the flooding posing a security risk. Dkt. 98-2 at 1. Because correctional staff told Nurse Richey that Mr. Ellis had "been up walking in his room and talking through cell door," she determined he could be assessed at a later time. *Id.*

A few hours later, Nurse Collins was passing out medication in the RHU when Mr. Ellis informed her that he had slipped and hurt his ankle and knees. *Id.* at 2. Nurse Collins could see that Mr. Ellis walked with a limp. *Id.* at 4. Due to the condition of the housing unit, Nurse Collins was not able to remove Mr. Ellis to bring him to the medical unit. *Id.* However, she examined him through the cuffport, and she wrote in her notes that she observed no swelling or discoloration. *Id.* Mr. Ellis attested, however, that Nurse Collins did observe swelling. Dkt. 105-1 at 11. Nurse Collins told Mr. Ellis that he already received

7

the maximum amount of pain-reducing medication that the provider would allow due to his other chronic issues. Dkt. 98-2 at 4. She counseled him to continue taking Tylenol, to apply ice and elevate his legs as much as possible, and that he already had an appointment in place to see the provider for another issue. *Id.* Mr. Ellis responded that "he is suing everyone who is doing him wrong including [Nurse Collins] and he would see [her] in court." *Id.* at 4-5. She responded that he would still be scheduled to see the provider and left.

Mr. Ellis attested that he saw non-defendant Dr. Heflin and NA Fulton on May 3 and told them "about [his] contaminated food and that [he] ate feces and got sick." Dkt. 105-1 at 11.

Mr. Ellis saw Dr. Heflin for an appointment on May 3. Dkt. 98-2 at 6. Mr. Ellis told Dr. Heflin that the medication he had been prescribed for pain was not helping, so Dr. Heflin discontinued that medication and started a trial of Pamelor, an antidepressant that can be used to treat pain. *Id.* at 7.[1] Dr. Heflin did not prescribe a cane for Mr. Ellis because he was "able to ambulate unassisted." *Id.* The notes from that visit and Mr. Ellis's other medical records do not mention gastrointestinal distress. *See id.*

Mr. Ellis had medical appointments in May 2023 for unrelated sinus and chest pain issues. *Id.* at 9-25.

Mr. Ellis saw a nurse on June 19, 2023, due to complaints of pain in his ankles, wrist, hand, arm, and neck. *Id.* at 29. The nurse contacted Dr. Heflin

---

[1] *See* National Library of Medicine, *Derry, et al.*, "Nortriptyline for neuropathic pain in adults," https://pmc.ncbi.nlm.nih.gov/articles/PMC6485407/ (last accessed Sept. 8, 2025).

who told her that Mr. Ellis did not need a referral at that time because he had not reported any changed conditions. *Id.*

After Mr. Ellis continued to complain of knee pain, Dr. Heflin ordered an x-ray of his knees on July 7. *Id.* at 35. NA Fulton completed the paperwork for Mr. Ellis to receive the x-rays. *Id.* at 38.

Mr. Ellis also submitted a healthcare request form asking that his meals be delivered to him. *Id.* at 39. Nurse Collins added a note to his medical record, stating, "Dr. Heflin responds, 'Had a visit today (7/7) discussed that meal delivery is not appropriate.'" *Id.*

Later that month, Dr. Heflin referred Mr. Ellis to get MRI imaging of his knees and referred him to physical therapy. *Id.* at 40-43.

In August 2023, Mr. Ellis submitted requests for another mattress, a cane, and a wheelchair. *Id.* at 46-50. Nurse Collins responded that Mr. Ellis had been seen by both the doctor and physical therapist several times and that they had not recommended these items, so they would not be provided. *Id.*

Mr. Ellis was transferred to a different facility on August 21, 2023, and Nurse Richey completed the medical transfer paperwork. *Id.* at 51-58.

### III.
### Discussion

Pursuant to the Court's Screening Order, Mr. Ellis proceeds on Eighth Amendment conditions-of-confinement claims based on the contaminated food and lack of access to clean clothes; a First Amendment retaliation claim

against Officer Samaniego-Puga; and Eighth Amendment medical care claims based on Mr. Ellis's fall in his cell. Dkt. 28.

### A. Conditions of Confinement

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

Exposure to human excrement for a period of several days can constitute an Eighth Amendment violation. *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007); *see also Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (noting that "the right to live in an environment free of accumulated human waste is

10

clearly established").In the context of food safety, prison officials must "provide inmates with 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.'" *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (quoting *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985)). Although an inmate must produce evidence of physical injury to recover compensatory damages for emotional harm, "an inmate may still obtain injunctive relief, nominal damages, and punitive damages based on psychological harm alone." *Byrd v. Hobart*, 761 F. App'x 621, 623 (7th Cir. 2019) (citing *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)).

Here, there are disputes of material fact as to whether Mr. Ellis was exposed to an objectively serious condition. Although the video exhibit shows correctional officers cleaning the common areas of the A-unit, the video does not show the dinner meal service, and it does not show that cleaning supplies were provided to inmates for their personal cell spaces. Thus, the Court examines whether each defendant was subjectively aware of a risk to Mr. Ellis's health or safety.

### 1. Defendants with no personal involvement

"Individual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).  Mr. Ellis designates no evidence showing that Medical Defendants Collins, Richey, McCord, or Fulton or State Defendant Kaylee Ross were personally involved in the clean-up of the

11

flooded unit or that they were aware of Mr. Ellis's potentially tainted food. The only designated evidence related to Defendant Fulton is Mr. Ellis's testimony in his affidavit that he saw her on A-unit two days after he ate the contaminated food and that he told her that he "ate feces and got sick." Dkt. 105-1 at 11. But there is no evidence that NA Fulton was aware of the flooding issue on May 1 or that Mr. Ellis asked NA Fulton for medical care related to his gastrointestinal issues on May 3. Thus, Medical Defendants Collins, Richey, McCord, and Fulton, and State Defendant Ross are entitled to summary judgment due to their lack of personal involvement.

### 2. Defendant Couch

Factual disputes preclude resolution of this claim as it relates to Mr. Couch. Although Mr. Couch says he cannot remember speaking to Mr. Ellis about the dinner trays, Mr. Ellis attested that he and other inmates warned Mr. Couch about the trays and that inmate workers observed that the food smelled of feces, but that Mr. Ellis was not provided a replacement tray regardless. Dkt. 105-1 at 5-6.

Mr. Couch cites to Seventh Circuit cases for the proposition that Mr. Ellis has failed to adequately allege an Eighth Amendment violation because the Constitution does not guarantee food that is served "in a culinary [sic] pleasing manner." Dkt. 96 at 9. Mr. Couch cites to *Lunsford v. Bennett*, 17 F.3d 1574, 1578-80 (7th Cir. 1994), a case about "cold, poorly prepared beans," *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988), which noted that prisoners cannot expect "the amenities, conveniences and services of a good

hotel," and *Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004), which notes that prisoners can't expect "food that is tasty or even appetizing[.]" Those cases didn't involve food that was potentially contaminated with human excrement, so they are distinguishable and do not support summary judgment for Mr. Couch. *See DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment.").

Mr. Couch further argues that he is entitled to summary judgment because Mr. Ellis has failed to prove that consuming tainted food caused him to become physically sick. But for a conditions-of-confinement claim, a plaintiff may obtain damages for psychological harm. *Byrd*, 761 F. App'x at 623. Accordingly, Mr. Couch's motion for summary judgment is **denied**.

### 3. Remaining State Defendants

State Defendants Fonseca, Carey, Looney, Harrold, Helle, Ross, Perry, Samaniego-Puga, Scott, and Lawson likewise are not entitled to summary judgment due to disputes of material fact.

These defendants argue that they responded reasonably to the threat of harm because the video reflects that they cleaned the A-unit with squeegees and that the lunch meals were in sacks that made no contact with the allegedly dirty cart. But Mr. Ellis attested that he told each of these defendants that the dinner cart was still soiled and that the food smelled of and contained feces. Dkt. 105-1 at 3, 5, 7-9.

State Defendants further argue that they are entitled to qualified immunity. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)).

Defendants frame their qualified immunity argument (as it relates to the conditions claim rather than the medical deliberate indifference claim) as follows:

> It has not been clearly established that using a squeegee to clean up a flood in a correctional facility housing unit is unconstitutional. Additionally, it is not clearly established that placing towels in front of offenders' cell doors to try to prevent water from entering the cell is unconstitutional. Also, it is not clearly established that serving packaged food to incarcerated individuals wearing gloves, is clearly unconstitutional.

Dkt. 92 at 19. Mr. Ellis does not allege that Defendants were deliberately indifferent for the manner in which they cleaned the common areas of the

14

housing unit[2] or for the lunch service. Rather, he alleges that the dinner trays were contaminated and that he was provided no clean clothing or cleaning supplies for his personal space for several days. It is clearly established that an inmate who is exposed to human excrement for an extended period of time has sufficiently stated a claim under the Eighth Amendment. *Vinning-El*, 482 F.3d at 924; *Hardeman*, 933 F.3d at 823. Thus, factual disputes prevent the Court from ruling in Defendants' favor on the qualified immunity defense at this stage. *See Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021) (explaining that though factual issues made qualified immunity at the summary judgment stage improper, "a jury may resolve disputed facts in [the defendants'] favor, and the district court could then determine he is entitled to qualified immunity as a matter of law."). For these reasons, Defendants Fonseca, Carey, Harrold, Helle, Ross, Perry, and Samaniego-Puga's motion for summary judgment is **denied** as to the Eighth Amendment conditions-of-confinement claim.

### B. Retaliation Claim

To succeed on a First Amendment retaliation claim, Mr. Ellis must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendant's decision to take

---

[2] The exception to this is Mr. Ellis's claim that Officer Samaniego-Puga intentionally squeegeed water into his cell. That claim will be addressed in the retaliation section below.

the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendant to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

Mr. Ellis alleged that Officer Samaniego-Puga intentionally squeegeed sewage water into his cell and told him that she did so because he had sued her in cause number 1:22-cv-2482-JRS-TAB. Dkt. 105-1 at 7. There is no dispute that filing a lawsuit is a protected First Amendment activity. The Court assumes that an inmate might be deterred from engaging in First Amendment activity if a defendant were to push contaminated water into his cell. However, the video evidence belies Mr. Ellis's testimony that Officer Samaniego-Puga intentionally pushed water into his cell. Rather, the video shows her directing the water away from the cells towards the outside. Ex. A at 29:30-30:40. Because the video evidence disproves Mr. Ellis's testimony, the Court need not credit it. *Scott*, 550 U.S. at 380-81. Officer Samaniego-Puga is entitled to summary judgment on this claim.

### C. Deliberate Indifference to Mr. Ellis's Knee Injury

Under the Eighth Amendment, prison officials must "provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate

indifference towards an objectively serious medical need." *Thomas*, 2 F.4th at 721–22. "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Defendants dispute that Mr. Ellis had a serious medical need when he fell and injured himself in his cell. When assessing the objective prong, the Court "look[s] for physical injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (cleaned up). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Given the pain medication Mr. Ellis received and the various diagnostic tests that Dr. Heflin ordered, the Court will assume a reasonable jury could find that Mr. Ellis had an objectively serious medical need.

Therefore, to avoid summary judgment, the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr.

Ellis's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Mr. Ellis "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Medical professionals may be found to be deliberately indifferent if they persist in an ineffective course of treatment, render a treatment decision that departs from accepted professional judgment, or delay in providing treatment. *Petties*, 836 F.3d at 729.

### 1. Correctional Defendants

Courts have "'long recognized' that correctional institutions typically 'engage in the division of labor' between medical professionals and other security and administrative staff." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (quoting *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). Thus, if an inmate is receiving care provided by medical professionals, non-medical prison staff may defer to their medical judgment unless the "official 'had reason to know that the[ ] medical staff w[as] failing to treat or inadequately treating an inmate." *Id.* (quoting *Miranda*, 900 F.3d at 343).

The undisputed evidence reflects that the correctional defendants who were privy to Mr. Ellis's fall reasonably relied on medical professionals' judgment. Sgt. Lawson contacted medical shortly after Mr. Ellis fell. Dkt. 105-1 at 8. Nurse Richey was unable to immediately check on Mr. Ellis because of the flooding situation, but she relied on correctional staff's report that Mr. Ellis was

18

walking around his cell and decided that he was not facing a medical emergency. Dkt. 98-2 at 1. Nurse Collins saw Mr. Ellis later that day and counseled him to take pain medication and ice his injury, and she informed Mr. Ellis that he had a provider visit scheduled. *Id.* at 2-4. Dr. Heflin saw Mr. Ellis two days later and changed his medication, and he subsequently referred him to receive x-rays and an MRI. *Id.*

This is not a situation where correctional defendants were aware that a prisoner's medical needs were being ignored. Mr. Ellis was evaluated and treated by medical professionals the day he was injured and at several follow-up appointments over the next few months. Accordingly, State Defendants are entitled to summary judgment as to all claims related to Mr. Ellis's medical care.

### 2. Medical Defendants

The Court examines the totality of Mr. Ellis's medical care when evaluating whether Medical Defendants were deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). "As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485 (7th Cir. 2022). But a nurse still maintains "an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015). Further, a nurse may be liable if she acts independently rather than pursuant to a physician's orders. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). "[W]hen a nurse is aware of an inmate's pain . . ., a delay in advising the

19

attending physician or in initiating treatment may support a claim of deliberate indifference." *Reck*, 27 F.4th at 485−86.

"The Eighth Amendment does not guarantee a patient his preferred medication or a pain-free recovery." *Weightman v. O'Brien*, No. 24-1543, 2025 WL 487214, at *3 (7th Cir. Feb. 13, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023)). Further, "an inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotation marks and citations omitted)).

First, Nurse McCord is entitled to summary judgment because there is no evidence that she was involved in treating Mr. Ellis's knee injury. *Colbert*, 851 F.3d at 657.

Next, Nurse Richey responded reasonably when she relied on medical officers' reports that Mr. Ellis's knee injury was not a medical emergency because he was observed walking around his cell. This judgment call was affirmed by Nurse Collins, who observed Mr. Ellis walking with a slight limp but no other major concerns. Nurse Collins advised Mr. Ellis to take his already-prescribed pain medication to alleviate his pain and to ice and elevate his legs, and she told him that he had already been scheduled to see the provider. No reasonable jury could find that these decisions were a substantial departure from accepted medical care, even if Mr. Ellis still experienced pain as he waited to see the doctor. *Weightman*, 2025 WL 487214, at *3.

When Mr. Ellis saw Dr. Heflin a few days later, he modified his pain medication but decided not to give him any assistive devices such as a cane or wheelchair because they were not medically necessary. Dkt. 98-2 at 6. Nurse Collins reasonably relied on Dr. Heflin's judgment when she subsequently denied Mr. Ellis' request for meal delivery or a cane. *Id.* at 39, 46-50; *Reck*, 27 F.4th at 485. Finally, NA Fulton's involvement in Mr. Ellis's care for his injury was submitting a request for x-rays at Dr. Heflin's direction. Dkt. 98-2 at 38. This limited and proactive involvement cannot be said to be deliberately indifferent.

Because the totality of the Medical Defendants' care for Mr. Ellis's injury reflects that they provided him with reasonable pain management and diagnostic testing, and that nursing staff appropriately deferred to Dr. Heflin's treatment decisions, they are entitled to summary judgment.

## IV.
## Conclusion

Medical Defendants' motion for summary judgment, dkt. [97], is **granted**. Mr. Couch's motion for summary judgment, dkt. [87], is **denied**. State Defendants' motion for summary judgment, dkt. [91], is **granted** as to all claims against Kaylee Ross, **granted** as to the retaliation claim against Carmen Samaniego-Puga, and **denied** as to the Eighth Amendment conditions-of-confinement claims. **The clerk is directed** to terminate defendants Nurse Tina, Nurse Richey, Nurse Shannon, Nurse Andrea, and Officer Ross.

The Court prefers that Mr. Ellis be represented by counsel for the remainder of this action. Mr. Ellis's pending motion for counsel, dkt. [119], is

**denied without prejudice** because it is not on the form prepared by this Court that has important conditions for the recruitment of counsel. The **clerk is directed** to send Mr. Ellis a motion for assistance recruiting counsel with his copy of this Order. He has **21 days** to renew his request for counsel by filing a motion for counsel using this form motion or to inform the Court that he wishes to proceed pro se. Once the motion has been ruled on and counsel has been recruited, the magistrate judge is asked to schedule a telephonic status conference to discuss further proceedings.

**SO ORDERED.**

Date: 9/17/2025

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana


Distribution:

DEMAJIO JEROME ELLIS
166596
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel

Magistrate Judge Tim Baker